HAWAIIAN NAVIGABLE WATERS
PRESERVATION SOCIETY,
Plaintiff,

v.

STATE OF HAWAII, et al., Defendants.

Randal T. BARBER, Plaintiff,

v.

UNITED STATES of America,
et al., Defendants.

Civ. Nos. 92–00607 DAE, 92–00758 DAE.

United States District Court,
D. Hawaii.

March 5, 1993.

Morgan J.C. Scudi, Huth, Farmer & Scudi, San Diego, CA, for plaintiff Hawaiian Navigable Waters Preservation Soc.

Robert A. Marks, Atty. Gen., Dawn N.S. Chang, Office of Atty. Gen., Steven S. Michaels, Atty. Gen.—State of HI, Honolulu, HI, for defendants State of HI, Rex Johnson, William W. Paty, Jr., David E. Parsons, Paul A. Dolan and Stephen L. Thompson.

**768**

Joseph A. Ryan, Honolulu, HI, for plaintiff Randal T. Barber.

Thomas A. Helper, Asst., U.S. Attys. Office, Honolulu, HI, for defendant U.S.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION, DENYING PLAINTIFF'S MOTION TO AMEND COMPLAINT, AND DENYING PLAINTIFF'S CROSS-MOTION TO STAY ENFORCEMENT OF HAWAII REVISED STATUTES 266-4 AND 266-25

DAVID ALAN EZRA, District Judge.

On February 16, 1993, the court heard oral argument on defendant State of Hawaii's motion for summary judgment and plaintiff's motion to stay enforcement of Hawaii Revised Statutes §§ 266-24 and 266-25 in *Barber v. U.S., et al.*, Civil No. 92-00758 DAE. Joseph A. Ryan, Esq. appeared on behalf of plaintiff. Dawn N.S. Chang, Deputy Attorney General, appeared on behalf of the state defendants. Thomas Helper, Assistant U.S. Attorney, appeared on behalf of the United States and the federal defendants.

On February 22, 1993, the court heard oral argument on defendants' motion for judgment on the pleadings or, in the alternative, for summary judgment; plaintiff's motion to amend complaint; and plaintiff's motion for class certification in *Hawaii Navigable Waters Preservation Society v. State of Hawaii, et al.*, Civil No. 92-00607. Katherine E. Bell–Moss, Esq. and Morgan J.C. Scudi, Esq. appeared on behalf of plaintiff. Dawn N.S. Chang, Deputy Attorney General, appeared on behalf of the state defendants.

Pursuant to its authority under Local Rule 220-2(e), the court determines that the federal defendants' motion for summary judgment in *Barber v. U.S.* is appropriate for disposition without oral argument.

After reviewing the motions and the supporting and opposing memoranda and after hearing oral argument, the court GRANTS the state defendants' motions for summary judgment in both cases, DENIES plaintiff Hawaii Navigable Waters Preservation Society's motions to amend complaint and for class certification, DENIES Barber's motion to stay enforcement of Hawaii Revised Statutes §§ 266-24 and 266-25, and GRANTS the federal defendants' motion for summary judgment.[1]

### I. Background

Act 379, 1988 Hawaii Session Laws, provided the Hawaii Department of Transportation with the authority to regulate anchoring and mooring within the ocean waters and navigable streams of the state. In 1991, the jurisdictional authority for recreational boating was transferred to the department of land and natural resources ("DLNR"). 1991 Haw.Sess.Laws., Act 272. The codification of those provisions is found at Hawaii Revised Statutes, Chapter 200. HRS § 200-6 provides:

> (b) No person shall anchor, moor, or otherwise place any vessel, houseboat, or other contrivance on or within the ocean waters or navigable streams of the State without a permit from the department [of land and natural resources].

In 1991, the Department of Transportation, pursuant to its authority under the Hawaii Administrative Procedure Act, HRS § 91-1 *et seq.*, adopted rules regulating anchoring and mooring in state waters. Hawaii Administrative Rules § 19-61 regulates small boat harbors. Section 19-66-31, Hawaii Administrative Rules, Exhibit D to *State Defendants' Memorandum in Support of Motion for Summary Judgment.*[2]

On February 1, 1991, the Department of Transportation was issued a federal permit for the installation of approximately 360 moorings at Ke'ehi Lagoon. The Department of Transportation and the United States Coast Guard are parties to a cooperative agreement that concerns the public waters of the state.

---

1. The above-captioned matters were consolidated by a separate order dated March 5, 1993.

2. All references are to the pleadings in *Hawaiian Navigable Waters Preservation Society v. State of Hawaii, et al.* unless otherwise indicated.

Hawaii Navigable Waters Preservation Society ("HNWPS"), a non-profit corporation acting on behalf of all adversely affected boaters at Ke'ehi Lagoon, commenced this action challenging the constitutionality of all Hawaii regulations and legislation affecting the rights of mariners to anchor and navigate in the ocean waters surrounding the islands of Hawaii.

HNWPS contends that the regulations are constitutionally infirm. They argue that Congress has exclusive jurisdiction over matters of navigation and that Congress has explicitly and implicitly preempted Hawaii's comprehensive regulatory scheme. Specifically, HNWPS contends that the scheme is preempted by the Submerged Lands Act, 43 U.S.C. § 1301, the scheme of federal special anchorage grounds established pursuant to 33 U.S.C. § 471, and federal safety regulations set forth at 33 U.S.C. foll. § 1602. Additionally, HNWPS contends that the instant regulations act as an unconstitutional duty on tonnage.

Before the court are the state defendants' motion for judgment on the pleadings or, in the alternative, for summary judgment; the motion of HNWPS for certification of a class of all persons who would be adversely affected by the regulations of the State; the motion of HNWPS to amend complaint, Barber's motion to stay enforcement of HRS §§ 266–24 and 266–25; and the federal defendants' motion for summary judgment against Barber.

## II. Standard of Review

Because the parties have submitted, and the court has considered, matters beyond the scope of the pleadings, the court considers only the motions for summary judgment and not the motions for judgment on the pleadings. Fed.R.Civ.P. 12(b).

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered when:

... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). The movant must be able to show "the absence of a material and triable issue of fact," *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987), although it need not necessarily advance affidavits or similar materials to negate the existence of an issue on which the nonmoving party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. *But cf., Id.,* at 328, 106 S.Ct. at 2555 (White, J., concurring).

■ If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence tending to support his legal theory. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 282 (9th Cir.1979). The opposing party cannot stand on his pleadings, nor can he simply assert that he will be able to discredit the movant's evidence at trial. *See T.W. Elec.,* 809 F.2d at 630. Similarly, legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Moreover, "if the factual context makes the nonmoving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics,* 818 F.2d 1466, 1468 (9th Cir. 1987), (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)) (original emphasis).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Eisenberg,* 815 F.2d at 1289.

■ However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec.,* 809 F.2d at 631. Also, inferences from the facts must be drawn in the light most favorable to the nonmoving party. *Id.* These inferences may be drawn both from underlying facts that are not in dispute, as well as from disputed facts which the judge is required to resolve in favor of the nonmoving party. *Id.*

### III.  Analysis [3]

#### A.  *Pullman* Abstention

The state defendants first argue that the court should abstain from deciding the instant case pending the resolution of *State v. Kelly,* Cr. No. 15A–30A, in the District Court of the First Circuit of Hawaii.

■ Under the doctrine of *Pullman* abstention, based on *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a federal court is required to abstain from hearing a case "when difficult and unsettled questions of state law must be resolved before a substantial federal question can be decided." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2326, 81 L.Ed.2d 186 (1984). In the Ninth Circuit, district courts are directed to apply a three-part test in determining whether *Pullman* abstention applies:

> First, the proper resolution of the state law question at issue must be uncertain. Second, a definitive ruling on the state issue must potentially obviate the need for constitutional adjudication by the federal court. Third, the complaint must touch upon "a sensitive area of social policy upon

which the federal courts ought not to enter unless no alternative to its adjudication is open."

*Burdick v. Takushi,* 846 F.2d 587, 588 (9th Cir.1988) (citations omitted).

Defendants have failed to show that abstention would render unnecessary resolution by this court of the constitutional issues in this case. Defendants contend that since HRS § 200–6(b)(1) specifically exempts vehicles engaged in interstate or foreign commerce, a state court interpretation of the scope of this exemption could eliminate a substantial portion of the federal claims raised in this case. That is not so since plaintiffs' challenge to the regulatory scheme is a much broader one. The complaint here extends to the authority of the state to regulate mooring within navigable waters, not to the scope of administrative action taken pursuant to uncontested authority.

Since resolution by the state court of the scope of the section 200–6 exemption of interstate commerce would not obviate the need for adjudication by this court of plaintiffs' constitutional claims the court declines to abstain and turns to the merits of the constitutional challenges to the regulatory scheme.

#### B.  Federal Preemption

In *Beveridge v. Lewis,* 939 F.2d 859 (9th Cir.1991), the Ninth Circuit sustained the constitutionality of a municipal ordinance enacted by the city of Santa Barbara restricting mooring and anchoring within the city harbor. In rejecting the contention that the ordinance there was preempted by the Ports and Waterways Safety Act ("PWSA"), 33 U.S.C. § 1221 *et seq.,* the court adopted the analysis for preemption set forth in *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978). There, the Court began its analysis with the reminder that

> prior cases indicate that when a State's exercise of its police power is challenged under the Supremacy Clause, "we start

**3.** Though the background of *Barber* and the instant case are identical, the parties raised separate constitutional challenges to the statutes at issue here. The court has consolidated the cases because common questions of law and fact predominate, but the court notes that Sections III C, III D, and III F consider arguments which were not raised by HNWPS.

with the assumption that the historic police powers of the state were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

*Id.* at 157, 98 S.Ct. at 994 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). It then explained that Congressional purpose "may be evidenced in several ways. The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose."

*Id.* (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152) (internal citations omitted).

■ Thus, there are two ways in which preemption can occur absent express language. First, Congress may implicitly occupy a field through pervasive regulation that leaves no room for supplemental action by the States. Second, federal law preempts local regulation where there is an actual conflict. *Beveridge,* 939 F.2d at 861.

The court turns first to a determination of whether the instant regulations actually conflict with any federal regulation and then to the issue of implicit preemption which, though not explicitly raised by plaintiffs, underlies their argument.

### 1. Submerged Lands Act

■ Plaintiffs first argue that the regulations are preempted by the Submerged Lands Act ("SLA"), 43 U.S.C. § 1311 *et seq.,* the act by which title to, and the power to manage, the lands beneath the navigable waters within the boundaries of the states were recognized as belonging to the respective states. Section 1311(b) provides:

The United States hereby releases and relinquishes unto said States and persons aforesaid, except as otherwise reserved

herein, all right, title, and interest of the United States, if any it has, in and to all said lands, improvements, and natural resources....

In support of their preemption argument, plaintiffs rely on section 1311(d), which reserves to Congress the power to regulate navigation. It provides:

Nothing in this subchapter ... shall affect the use, development, improvement, or control by ... the United States of said ... waters for the purposes of navigation ...

That provision, plaintiffs contend, expresses Congress' intent to retain exclusive jurisdiction over matters affecting navigation. That contention is without merit. By its own terms, section 1311(d) does not offer any indication that Congress intended to retain exclusive rather than concurrent jurisdiction over the navigable waters of the states. Normally, if the language of a statute is unambiguous, its plain meaning controls. *In re Perroton,* 958 F.2d 889, 893 (9th Cir.1992).

This plain language reading is supported by the legislative history of the SLA as well as previous court decisions. The House Committee reporting on the SLA stated:

... [T]he bill provides that, except to the extent that it is exercised in a manner inconsistent with applicable Federal laws, the police power of each coastal State may extend to that portion of the Continental Shelf which would be within the boundaries of such State if extended seaward to the outer margin of the shelf.

H.Rep. No. 215, 83rd Cong., 1st Sess. 2 (1953), *reprinted in* 1953 U.S.C.C.A.N. 1385, 1406. That comment apparently expresses Congress' intent that the SLA not, by itself, serve as a basis for preemption. This interpretation is supported by the permissive language used by the committee in reporting on the powers reserved to the United States. The committee stated:

Section 15(b) provides that the Secretary of Defense, with the approval of the President, *shall have the power* to prohibit any operations in those areas of the shelf as are needed for navigational purposes or for national defense.

*Id.* Again, there is no evidence of congressional intent to retain exclusive jurisdiction over the navigable waters of the states and significant evidence to the contrary.

No court has read section 1311(d) as a manifestation of congressional intent to occupy the entire field of regulation of navigable waters. This is because there is no reason to suspect that the section is any more than an expression of the well-established proposition that the federal government retains a paramount navigable servitude in the waters of the states. *See, e.g., Bonelli Cattle Company v. Arizona,* 414 U.S. 313, 329, 94 S.Ct. 517, 527, 38 L.Ed.2d 526 (1973); *Philadelphia Co. v. Stimson,* 223 U.S. 605, 633–635, 32 S.Ct. 340, 349–350, 56 L.Ed. 570 (1912).

The retention of this servitude does not, as plaintiffs suggest, mean that the federal government has exclusive control over state waters. All the retention of the servitude means is that the government may, without paying compensation, decrease the value of riparian property. *Boone v. U.S.,* 944 F.2d 1489, 1494 (9th Cir.1991) ("... the navigational servitude generally relieves the government of the obligation to pay compensation for acts interfering with the ownership of riparian, littoral, or submerged lands which, if not for the fact that a waterway is involved, would require compensation under the fifth amendment.") *See also Bonelli Cattle,* 414 U.S. at 331, 94 S.Ct. at 528; *St. Anthony's Falls Water Power Co. v. St. Paul Water Comm'rs,* 168 U.S. 349, 18 S.Ct. 157, 42 L.Ed. 497 (1897).

The preemptive effect of the servitude can be no greater than that of the commerce clause from which it is derived. Federal action taken pursuant to the servitude preempts state action if the state action is explicitly or implicitly preempted or is in actual conflict with the federal law.

The SLA does not by itself provide any evidence of an actual conflict between federal law and the instant legislation. A different case would be presented were it true that Congress, pursuant to its retained navigable servitude, had enacted some provision which conflicted with the Hawaii regulatory scheme. But that is not so here. By itself,

the SLA cannot sustain a claim of preemption.

### 2. *33 C.F.R. § 110.128d(c)*

■ Plaintiffs next argue that 33 C.F.R. chapter I, which establishes a special federal anchorage area in Ke'ehi Lagoon, preempts additional state regulation within that area. Additionally, plaintiffs argue that the Coast Guard's allowance of regulatory action by the state within Ke'ehi Lagoon constitutes an impermissible delegation of power in violation of 33 C.F.R. § 1.05–1(g). Each of these arguments is without merit as there is no actual conflict between the Hawaii and federal regulation.

33 C.F.R. § 110 establishes two broad classes of anchorage regulations: special anchorage areas (Subpart A) and anchorage grounds (Subpart B). 33 C.F.R. § 110.1(a) regulates all of Subpart A and states:

> The areas described in Subpart A of this part are designated as special anchorage areas pursuant to the authority contained in an act amending laws for preventing collisions of vessels.... Vessels not more than 65 feet in length, when at anchor in any special anchorage shall not be required to carry or exhibit the white anchor lights required by the Navigation Rules.

Subpart A then notes areas in which navigation lights are not required. It does not make any reference to physical mooring or anchoring. Subpart B is concerned with that issue: "The anchorage grounds for vessels described in Subpart B of this part are established...." 33 C.F.R. § 110.1(b).

The waters of Ke'ehi Lagoon are a special anchorage area included in subpart A of section 110. 33 CFR § 110.128d(c). As such, they are regulated solely with respect to required lighting and not with respect to physical anchoring and mooring.

Any argument that the areas referred to in Subpart A refer to anchoring and mooring as well as illumination is foreclosed by *Beveridge.* There the court noted:

> The district court's proper understanding that Subpart A refers to required lighting and Subpart B to anchoring is buttressed by two other considerations. First

33 C.F.R. § 109.10 states that an act of Congress "provides for the designation of special anchorage areas wherein vessels not more that sixty-five feet in length, when at anchor, will not be required to carry or exhibit anchorage lights. Second, ... [i]f A were meant to refer to anchoring as well as lighting, surely it would be redundant to describe different anchoring areas in the same harbors in B."

*Beveridge,* 939 F.2d at 865.

The conclusion that there is no actual conflict between state and federal regulation here is further supported by the fact the Coast Guard, Congress' delegate of authority on matters related to anchorage, *see* 33 U.S.C. § 471, concluded that no actual conflict exists. In an opinion letter obtained by defendants, the Coast Guard Legal Office stated:

> Through their inherent police powers, states have concurrent authority with the Federal government over navigable waters of the United States within their respective state borders. State or local governments may establish, maintain and charge reasonable fees for mooring within a Federally designated Special Anchorage Area.

Exhibit G to *Defendants' Motion for Judgment on the Pleadings.*

Plaintiffs contend that this opinion is an improper delegation of authority in violation of 33 CFR § 1.05–1(g)(1). That section provides:

> ... The Commandant redelegates to each Coast Guard District Commander, with the reservation that this authority shall not be further redelegated, the authority to issue rules and regulations pertaining to the following:
>
> (1) Anchorage grounds and special anchorage areas.

Though this argument is not clear, plaintiffs apparently contend that the opinion letter acts to redelegate authority to the State of Hawaii for regulation of special anchorage areas.

There is no evidence here that the Coast Guard has abandoned its regulatory authority. To the contrary, the Coast Guard has done precisely what is contemplated by sec-

tion 1.05(1): establish a special anchorage area at Ke'ehi Lagoon. All the advisory opinion states is that state regulation is permissible to the extent it does not conflict with existing Coast Guard regulations. It cannot be characterized as a redelegation.

Since special anchorage areas are not concerned with mooring, there is no conflict here. 33 C.F.R. § 110 cannot support a claim of preemption.

*3. 33 U.S.C. § 2030*

■ Plaintiffs next contend that the Hawaii regulations are preempted by federal regulations which require an anchored vessel to be manned in order to respond to emergency conditions. Plaintiffs cite no authority for this proposition. *Plaintiff's Memorandum in Support of Opposition to Defendants' Motion* at 25. As best the court can discern, plaintiffs base their argument on 33 U.S.C. § 2030. That section provides:

> A vessel at anchor shall exhibit where it can best be seen:
>
> (i) in the fore part, an all-around white light or one ball; and
>
> (ii) at or near the stern and at a lower level than the light prescribed in subparagraph (i), an all-round white light.

Section 2030 does not require anchored vessels to be constantly manned in order to respond to potential emergencies. On an ordinary clear night, the maintenance of a proper anchor light is the only precaution to warn other vessels that an anchored vessel need take. *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895). *See also Hutton v. Walter G. Hougland, Inc.,* 321 F.2d 595 (5th Cir.1963) (no duty to keep watchman aboard anchored vessel in addition to duty to maintain adequate anchor lights).

Furthermore, even if federal regulations did create some duty to maintain an overnight presence aboard an anchored vessel there is no evidence of any actual conflict created by the Hawaii regulations. HRS § 200–10 specifically provides for liveaboard fees to be paid by individuals using a moored vessel as a place of principal habitation. Plaintiffs respond that "deposition testimony also indicate [sic] that the State will no long-

er issue permits for 'living aboard' a vessel...." None of the testimony offered by plaintiffs supports this conclusion. In general, the affidavits submitted by plaintiffs indicate nothing more than the fact that plaintiffs are dissatisfied with having to pay the mooring fees charged by the State of Hawaii. *See e.g.,* Affidavit of Fraser Ininns, Exhibit 10 to *Plaintiff's Memorandum In Support of Opposition.* ("... I am denied the right to man my vessel, and the charge that they would like to impose upon me is unacceptable....")

Because there is neither a constitutional nor a statutory right or obligation to live aboard one's vessel, 33 U.S.C. § 2030 cannot serve as a basis for preemption. Moreover, even if such a right or obligation did exist, plaintiffs have shown no significant evidence that the state has prevented individuals from living aboard their vessels.

#### 4. Implicit Preemption

Though the challenge in *Beveridge* centered on the preemptive effect of the PWSA, the logic of the court's reasoning is applicable in the instant case. There, the court noted that

> ... just because Congress has intended to reduce the possibility of cargo and vessel loss, prevent damage to structures on or near navigable waters, ensure that vessels comply with certain standards, and just because it believes that 'navigation and vessel safety and protection of the marine environment are matters of major national importance,' does not necessarily mean that the city ... is completely trammeled in all regulatory efforts.

*Beveridge,* 939 F.2d at 863. The court went on to note that the PWSA, while comprehensive, was not demonstrative of federal intent to occupy the entire field. *Id.* at 864. (citing *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 489 (9th Cir.1984), *cert. denied sub nom., Chevron U.S.A. v. Sheffield,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985) ("[C]omprehensiveness alone is not enough to demonstrate a federal intent to occupy the entire field.") The SLA, and the federal regulations relied upon by plaintiffs, are no more comprehensive than the PWSA.

■ It is undisputed that the Secretary of Transportation and the Coast Guard have extensive authority to regulate the anchoring, mooring, and movement of vessels. But this power is discretionary. These authorities may act to affect all of these navigational issues, but they need not. Accordingly, the court concludes that the SLA and C.F.R. Chapter 33 do not implicitly preempt the Hawaii regulatory scheme.

This conclusion is supported by the fact that navigation and anchorage issues are traditional matters of local concern. The Supreme Court recognized this in *The James Gray v. The John Fraser,* 62 U.S. (21 How.) 184, 187, 16 L.Ed. 106 (1858):

> And the local authorities have a right to prescribe at what wharf a vessel may lie, and how long she may remain there ..., where she may anchor in the harbor, and for what time; ... And there is nothing in the regulations referred to in the port of Charleston which is in conflict with any law of Congress....

In *Beveridge,* the court recognized that navigational issues had changed considerably over the intervening century, but questioned whether the time had any effect on the proposition that navigation is a matter of local concern:

> While federal regulations over the past century has greatly qualified this sweeping statement, there is no reason to believe that Congress intended to occupy the field in the area of mooring any more than in tankers or marine pollution. It might even be said that localities retain greater autonomy in this area. *Cf. Bass River Associates v. Mayor of Bass River Township,* 743 F.2d 159 (3rd Cir.1984) (township's prohibition of "floating homes" not preempted by federal vessel licensing regulations).

Since there is no evidence that Congress intended to occupy the entire field of navigation, and significant evidence to the contrary, and since there is no actual conflict between the Hawaii regulations and federal law, the Hawaii regulatory scheme is not preempted by federal law.

## C. Commerce Clause

On their face, the Hawaii regulations do not implicate the interstate Commerce Clause. Plaintiffs have asserted, without authority, that all vessels entering Hawaii are engaged in interstate commerce. But HRS § 200–6(b)(1) specifically exempts vehicles engaged in interstate or foreign commerce, and plaintiffs have shown no evidence to indicate that the regulation has been enforced in a manner inconsistent with the language of that provision.[4]

■ This court has previously held that the State of Hawaii may regulate transportation among the islands so long as the proposed conflict is not in conflict with any existing federal regulation. *Matson Navigation v. Hawaii Pub. Util. Com'n,* 742 F.Supp. 1468, 1484 (D.Haw.1990). Plaintiffs, again missing the point of preemption, argue that because Congress has the power to regulate transportation among the islands (by virtue of the fact that travel between two points within the islands often necessarily involves passage over international waters), the existence of that power precludes any state regulation. This court explicitly rejected that argument in the context of the commerce clause:

> Although this court is convinced that Congress has the power under the commerce clause to regulate commerce involving navigable and international waters, this court does not find that this necessarily prohibits the State of Hawaii from regulating commerce between places within the state solely because it involves such waters. . . .

*Id.* We added:

> To hold that the State of Hawaii may not regulate transportation between islands, even where there is no federal regulation, merely because such transportation passes over the high seas, would in effect place

Hawaii on a different footing than the rest of the states in the union. It would also create an anomalous situation where such shipping and shippers would in fact be wholly unregulated to the severe detriment of the people of Hawaii.

*Id.*

■ The instant regulations may create an indirect burden on interstate commerce by regulating the mooring of ships that at some time originated out of the state. Such regulation is permissible if the state regulates evenhandedly, has a legitimate interest, and the local benefits outweigh the burden on interstate commerce. *Pike v. Bruce Church,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

Plaintiffs have shown no evidence that the state has regulated mooring in an unreasonable manner. Defendants present significant evidence that conflicting uses between recreational ocean users and vessels conducting passive mooring activities poses a substantial threat to public safety because of the heavy traffic on the seaways. *See* Exhibits A and C to *Defendant's Memorandum In Support of Motion.* Defendants offer nothing but conclusory arguments by way of rebuttal. Since there is little, if any, burden on interstate commerce, any challenge based on the commerce clause is without merit.

## D. Equal Protection Clause

When a local regulation is challenged as violating the Equal Protection Clause, courts generally defer to legislative determinations as to the desirability of particular statutory discriminations. *See e.g. Lehnhausen v. Lake shore Auto Parts Co.,* 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973).

> Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, reli-

---

4. Plaintiffs state, "Parsons indicated in his deposition that even a vessel in interstate commerce is subject to the regulations of the State if that vessel intends to anchor in the waters over which the State asserts its authority." The reference is apparently to David Parsons, the Hawaii Boating Regulation Manager and a defendant in this case. Again, however, plaintiffs have not provided the deposition testimony to which they refer.

In a motion for summary judgment, the opposing party cannot stand on his pleadings, nor can he assert that he will be able to discredit the movant's evidence at trial. *T.W. Elec.,* 809 F.2d at 630. Similarly, legal memoranda are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways,* 585 F.2d at 952.

gion, or alienage, [court] decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest.

*City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976).

■ The right of access to mooring privileges is not a fundamental right. Though penalties on travel may implicate a fundamental interest, the penalty required to invoke strict scrutiny involves a genuinely significant deprivation such as denial of the basic necessities of life or the denial of a fundamental political right. *Fisher v. Reiser*, 610 F.2d 629, 639 (9th Cir.1979) *cert. denied*, 447 U.S. 930, 100 S.Ct. 3029, 65 L.Ed.2d 1124 (1980). Regulation of mooring privileges do not implicate the sorts of interests necessary to trigger strict scrutiny. *See Hawaii Boating Ass'n v. Water Transp. Facilities*, 651 F.2d 661, 665 (1981) (applying rational relation test to durational residency requirements for preferential rates for mooring privileges in recreational boat harbors). Accordingly, the court examines the instant regulations for a rational relation to a legitimate state interest.[5]

■ The court finds that the State of Hawaii has a legitimate interest in insuring the safe use of ports by recreational boaters and that the contested regulations are rationally related to this objective. HRS §§ 200–4 and 200–6 were established to avoid conflicting uses between recreational ocean users and vessels conducting passive mooring and anchoring activities. The state concluded that such conflicting uses posed a substantial threat to public safety because of the heavy water traffic at Ke'ehi Lagoon. The court finds that this response was not irrational. Accordingly, a claim based on the Equal Protection Clause is without merit.

### E. Fourteenth Amendment Takings Claim

■ Any claim based on the Takings Clause of the Fourteenth Amendment is also without merit. In order to invoke the Takings Clause, a plaintiff must show either a direct appropriation of property, or a regulation that denies all economically beneficial or productive use of land. *Lucas v. South Carolina Coastal Council*, — U.S. —, —––—, 112 S.Ct. 2886, 2992–3, 120 L.Ed.2d 798 (1992). Plaintiffs have made neither showing here. At the most, and indeed this much is arguable, the state regulations act to diminish somewhat the value of the boats that moor in Ke'ehi Lagoon. As such, the regulations do not affect plaintiffs in a manner that implicates the Fourteenth Amendment.

### F. Duty on Tonnage

■ Plaintiffs finally argue that the mooring and anchoring fees charged by the state are a duty on tonnage in violation of Article I, Section 10 of the U.S. Constitution. A state is not prohibited from charging reasonable fees in return for services rendered. *Clyde Mallory Lines v. Alabama*, 296 U.S. 261, 266, 56 S.Ct. 194, 196, 80 L.Ed. 215 (1935). Here fees for mooring are charged for use of restroom facilities, parking, trash disposal, and security. *Defendants' Reply Memorandum*, Affidavit of Keliikuli at 2. Accordingly, plaintiffs' article I challenge is denied.

### G. Plaintiff's Motion to Amend Complaint

■ Under Fed.R.Civ.P. 15(a), after twenty days from the date when the initial complaint was served, "a party may amend [its] pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Although the rule should be interpreted with "extreme liberality," *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981), leave to amend is not to be granted

---

5. Plaintiffs contend that "regulations purporting to exercise a state's police powers must be reasonable and must constitute the least restrictive means to achieve the desired purpose" citing *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). *Plaintiff's Memorandum in Support of Opposition* at 33. That argument badly misstates the law. *Mosley*

stands for the proposition that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives. *Mosley*, 408 U.S. at 101, 92 S.Ct. at 2293. Neither *Mosley* nor any other case requires that states always narrowly tailor their legislation to their purposes. All that is required is that the actions be rationally related. *Hawaii Boating Ass'n*, 651 F.2d at 666.

automatically. "A trial court may deny such a motion if permitting an amendment would prejudice the opposing party, produce an undue delay in the litigation, or result in futility for lack of merit." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir.1990).

Each of these factors favor denial of plaintiff's motion. Plaintiffs have not set forth with any specificity the grounds for their motion to amend. Their motion, filed after defendants filed a motion for summary judgment, accordingly presents a substantial risk of prejudice to defendants. Prejudice to the opposing party is the most important factor to consider in a motion to amend. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330–31, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971). Furthermore, on the basis of the above analysis, the court concludes that plaintiff's attempt at amendment would be futile for lack of merit. Accordingly, plaintiff's motion to amend is denied.

### H.  Motion for Certification of Class

Fed.R.Civ.P. 23(a) provides for certification of a class where:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Plaintiffs define their proposed class as all

[all] individuals who use and are interested, or who may become interested, in the use of the navigable waters claimed by the State of Hawaii for the purpose of recreational, residential, and commercial boating and navigation . . .

*Complaint*, ¶ 15. There is some question whether HNWPS should have sought leave of this court to proceed on behalf of the individuals affected by the regulations at Ke'ehi Lagoon. Because the court finds that HNWPS has met all the requirements of Rule 23(a) with respect to the individuals at Ke'ehi Lagoon the court has allowed HNWPS to proceed on behalf of that class. Any attempt to further expand that class, however, is without merit. The expansion proposed by plaintiffs establishes a class that is potentially infinite. Plaintiffs have made none of the showings required by Rule 23(a) with respect to this proposed expanded class. Accordingly, plaintiff's motion must be denied.

### I.  Barber's Motion to Stay Enforcement of Hawaii Revised Statutes Sections 266–24 and 266–25 [6]

The court treats plaintiff's motion to stay enforcement as a motion for preliminary injunction. The standard for granting a preliminary injunction is well settled in the Ninth Circuit:

To obtain a preliminary injunction, a party must show either (1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor. *Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521, 523 (9th Cir.1984). These are not two distinct tests, but rather the opposite ends of a single "continuum in which the required showing of harm varies inversely with the required showing of meritoriousness." *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987) (quoting *San Diego Comm. Against Registration and the Draft (CARD) v. Governing Bd. of the Grossmont Union High School Dist.*, 790 F.2d 1471, 1473 n. 3 (9th Cir.1986)).

*Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988). Because Barber has shown neither a likelihood of success nor serious questions on the merits of this case his cross-motion must be denied.

### J.  Federal Defendants' Motion for Summary Judgment

For the reasons set forth above, the court grants the federal defendants' motion for

---

**6.** Sections 266–24 and 266–25 are the enforcement provisions for regulations of the Department of Transportation.

summary judgment against Barber.[7]

### IV. Conclusion

For the reasons set forth above, the court GRANTS the state defendants' motion for summary judgment in both cases. The court also GRANTS the federal defendants' motion for summary judgment against Barber.

The court DENIES the motions of HNWPS to amend complaint and for certification of class. The court also DENIES Barber's motion to stay enforcement of HRS §§ 266–24 and 266–25.

IT IS SO ORDERED.

---

7. Because the court finds plaintiffs' various constitutional claims to be without merit, it need not reach the state and federal defendants' claims of immunity.